Case number 23-1235 et al. Hood River Distillers, Inc. Petitioner versus National Labor Relations Board. Ms. Petrova for the petitioner, Ms. Beard for the respondent. May begin, thank you. Thank you. May it please the court, Sasha Petrova on behalf of Petitioner Hood River Distillers. I'd like to reserve two minutes of my time for rebuttal, please. The board's decision in this effectively means that no matter how diligently an employer pursues bargaining with a union, no matter how long the parties actually bargain for on the same critical issues, a union can still avoid impasse by simply denying that it exists, making incremental 11th hour movements, and then placing conditions on bargaining that it knows are impossible to meet in order to avoid having to test an employer's last, best, and final offer. The record in this case does not support the board's conclusion. For 14 months, HRD attempted to make a new agreement with the union. HRD offered upwards to 80 bargaining dates with the union. Ms. Petrova, are you aware of any cases where a court has concluded that there was no valid impasse when the parties negotiated for 14 months or more? I'm not aware of such a case. If we agree with you that there was an impasse, should we vacate the board's order in its entirety? We did make a couple concessions in our reply brief as to which parts of the board's order do not directly stem from the impasse determination, but for the most part, the impasse determination is what drove the majority of the violations findings and the remedy that was actually implemented. I don't understand if that's a yes or no. Yes, please. We would ask that if you find an impasse that we would vacate the decision. Do you know, moving from impasse to dilatory tactics and bad faith, do you know if this court has ever relied on dilatory tactics to conclude that an employer had a right to unilaterally implement its last offer? Your Honor, I'm not aware of any instances of this court actually finding that that exception would apply. The one case that we discussed in the briefing is the Saramonte Oldsmobile case, and in that case, this court found that the exception to impasse rule didn't apply ultimately because the challenge delay was about a month for the union to come to the bargaining table, and when it did get there, the union apparently didn't make any specific proposals or counterproposals on that date, and in that case, the ALJ found that the evidence was not clear as to which party was primarily responsible for that month of delay, and so under those circumstances, there was no exception to impasse. But here, we have something much, much different, and I think the briefs adequately explain the length of delay, the overwhelming amount of time that HRD spent. Let's talk about the 14 months because it seems to me that there was a lot of progress in the first seven months, and you came very close to reaching agreement, but then it was HRD that sort of scrambled the negotiations because HRD made a decision that they really wanted to focus on health care, and there's like a balance between like should we focus on achieving our goals on health care plan versus wages, and it seemed that after seven months of negotiation and people got very close to a deal, HRD changed its focus, and then we're looking at the second half of the seven months, and then there was a month where there was delays in January where it was nobody's fault, but ice storms, medical things happened, and then they start negotiating again in March, and then on the last bargaining day, it was productive. There was movement, and then there was an HRD email that said I appreciate the progress the parties made today on health care. However, the company and the other open matter matters, but it's hard to say that you're at the end of your rope and it's an impasse when you've just said I appreciate the progress we've just made, and there was movement on wages as well because both you moved. You added an extra year to the bargain. You had said we want one percent for these three years, and you've added a fourth year, so you moved on wages, and they moved on wages because they said now we're going to accept something lower than what we originally had, so it's just really hard for me to see that there's an impasse given that the last time you bargained, there was movement on both sides. So, your honor, we would take issue with that characterization of the record in some respects because at the very start of bargaining, it was made clear to the union that there were going to be significant concessions requested on both health care and wages, and from the start, there was a wide gap. I believe the first offer was a six percent total increase in wages from the union at the very start of negotiations and no move to health plan. Now, by the end of negotiations, yes, that gap on wages decreased, and the union proposed potentially to move to the employer health plan. That seems like huge progress. After 14 months of back and forth. Well, I kind of look at this as the back seven because the first seven was productive, and the reason it got sort of wiped out was because HRD changed its position. Respectfully, we would disagree. HRD has been consistent that it would not entertain a wage increase of higher than one percent since about September. But on March 30th, you added a year, which is a change. That's a change to your wage negotiating position. So, that change was based on the fact that the parties had been negotiating for 14 months. So, it basically is essentially made in order to make sure that the parties actually entered into a three-year perspective agreement rather than something much, much shorter. Okay, but you changed your position. You added a year. It's a negotiation about wages. You were saying one percent for these three years. Now, you're adding a fourth year. So, that's a change in your position. I'm just saying it doesn't look like an impasse to me when you're making a new offer on wages. It was a new offer on only in the length of the actual contract, but effectively, that's real money because the one percent builds on what's come before it. You've changed your position of wages. I think the bottom line, though, is that the one percent increase, we'd never strayed from the one percent increase, and despite every offer that was made to us suggesting 2.5, 2.25. You never strayed on the amount of the increase, but you strayed on the number of years it covers, which is a different amount of money. So, it's a different change in wages. So, and I think the bottom line being that it was still much more, a bigger increase that HRD was willing to entertain, and it had explained that position very clearly to the union on the 30th, and I don't think it's... I guess the point is, this is a deferential standard review. We just have to see if the board's decision is supported by the evidence, and the board says, this wasn't an impasse. There was all this movement on March 30th, which was the last time you bargained, and that's supported by the evidence. You moved, and they moved. March 30th, that's it. So, that's supported. There was movement at the last bargaining session, but it was very incremental, and the point here is... It doesn't matter. It's not an impasse. You're not at the end of your rope. We were at the end of the rope, and we specifically said that in our last, best, and final offer. There's no reason to doubt... You said that for the fifth time at that point. Our position on that, and I will address that certainly, but it was actually one prior LBF, but the point being here is that there was an offer on the table that said that we, the employer, are unwilling to move any further than the final offer, and it was communicated very clearly, and in response, all we got was, we're not going to meet with you further unless it's in person, which was impossible at the time, and so, our position is that we were at the end of our rope. There was no reason to doubt that we were at the end of our rope. Except that you said you were at the end of your rope four times before, and you weren't. You kept negotiating. So, our position is that we were not at the end of our rope four times, and it was one LBF, and I'm happy to address that. Well, the issue is, have you used the same or similar language when you were acting like you were final, you know, in your decision-making, such that we would then say, well, it didn't appear to be final because you said it before? I think there was significant difference in the LBF that came in March 30th. So, first, it was issued through HRD's attorney, which the prior offer was communicated through the HR manager. But I'm asking about language. Yes, and the language specifically in March 30th, it made clear in very certain terms that there was no more room on wages, and the record reflects this. And so, it was qualitatively different. And the first LBF came at the heels of about one and a half months of HRD not hearing back from the union after making its last proposal. And as the court is, I'm sure, well aware, impasse is intended to continue negotiations. It's a point in time, and it can be overcome. And so, here, the record does not reflect any indication that HRD made the last best offer initially in any bad faith. It wanted to continue negotiating with the union. It was attempting to schedule for- But the issue is just the credibility of you declaring an impasse when you've previously done so, and it wasn't real. How is the union supposed to know when you mean it and when you don't, when you just do this as a bargaining? There's evidence in the record that your HR person said that you would declare an impasse without meaning it. This is JA 2094-96, Human Resources Manager Janine Summerfield. If we were still not going to hear anything or any movement from them, we were willing to take the next step. Yes, we were hoping we would get back to the bargaining table. That's the in response to a question about why did you declare an impasse? They just wanted to set dates, and they would declare an impasse. And then the question was, I believe you testified that this declaration of impasse, you really didn't mean to declare impasse, but this was more of a bargaining strategy to get the union back to the table. Do you recall that testimony? Answer, yes. Best case scenario. Best case scenario. That is what we were hoping to do, to get some bargaining dates on the calendar and not to have to declare an impasse. So you're strategically declaring impasses throughout this negotiation. How are they supposed to know when you really mean it? I would, again, disagree. So sure, there was a declaration of impasse, and it was intended to bring the union back to the bargaining table. There is nothing in the record that suggests that that's a nefarious intention. I'm not saying it's nefarious. It's just that when do we take it seriously when you're declaring an impasse? When sometimes you do it just to get them back to the bargaining table, and then sometimes you do it, and then all of a sudden unilaterally impose your own terms. I think in this case, it is very clear at the end. Again, a very detailed letter was issued by the- I mean it this time. There is a different gravity coming from a party's attorney, I would say. It imbues the with legitimacy. This is our final bargaining position. We are using the word impasse because we are at the very end of our rope, and we are- You're saying the other side of the table, they're supposed to be reading into what you're saying, depending on who's saying it. I feel that's not their responsibility. It should be your responsibility to speak with one voice when you're negotiating. So sure, but a position can change. And so after the first impasse declaration was about, I think, eight months into the negotiations. Now we're at about 13 to 14 months in. It has been a protracted negotiation, and there's nothing here to suggest- This is important, I believe. There's nothing here to suggest that the union was actually confused about whether the last offer was a last, best, final, legitimate offer. Actually, the union reached out on May 1st, the date of implementation, and said, hey, can you guys hold off on implementing the offer? So the record reflects that the union understood this was going to be implemented, and it had an obligation at that point to respond. There's nothing here to suggest that the union was confused, and that's why it didn't respond or didn't engage with the last, best, and final on March 30th. So I think that's very important, because the union could have reached out to test this, and I'm not saying that it's the union's obligation necessarily, but the evidence shows that there was no confusion. So any contrary finding that it detracted from the legitimacy of HRD's ability to issue a final offer? So their response was, let's have a face-to-face mediation, and you're saying, well, that's impossible. But at that time, it wasn't clear how long the pandemic was going to last, because we're talking March 30th. This is early days of the pandemic. So that doesn't seem to be a dilatory tactic. It doesn't seem to be an unreasonable position to take in that moment. In retrospect, it's like, well, yeah, we're talking a long pandemic. But back then, they didn't know that. Sure. So we're not contesting the fact that the union might have, at some point, thought the pandemic would only last a couple of weeks. What we are contesting here is on the evidence in this case that- But they don't think it's over. They want to continue mediating. They don't want to continue meeting, because we've repeated- They asked for face-to-face mediation. They didn't ask for it. They insisted that any further mediation, meetings that occur- But they want to keep talking. They don't want to keep talking, because we, so respectfully, we disagree. The record reflects that every time that we reached out, said we are more than happy to meet with the federal mediator. By the way, something that HRD initially suggested, and the union declined to accept the offer to mediate with a federal mediator. This still comes down to deference to the board's findings, and what those findings were particularly stated on the record, with respect to the negotiations. So how can you get us away from that? So the- Correct. This is a deferential- Generally, impasse is a deferential issue, but this court, clearly in its jurisprudence, does not rubber stamp any impasse decision, and does consider the record as a whole. Our position here is not that there's a credibility finding that we're disputing. So we're not saying- We just agreed to mediation, just not in-person mediation. So that even moves the ball further to say it wasn't at an impasse. So the fact that we continually left the door open for the union to break the impasse, that should not go against HRD. Clearly, impasse, again, is a moment in time. It is a deadlock that is intended to be broken. It's meant to be broken. That's the whole point. We want parties to reach agreement. But impasse exists where the parties have reached the end of their rope, and if you're leaving the door open, you're not done. The record, and I would ask that the court review the record site specifically in the reply brief on this. The record is clear. We communicated. We are at the end of our rope on wages. We have rejected multiple, multiple times when the union has proposed something- What healthcare dealt with were you done there? So towards the end, there was a potential agreement on moving to HRD's healthcare. But the main sticking point, the wages, is something that has communicated as one of the most important issues in this entire negotiation. From the very beginning, there was no further room on that. And just because the union says, yes, we will continue negotiating or there is further room, that alone cannot defeat impasse because- So can we just review what happened on March 30th? Yes. You proposed a four-year contract. That was the first time you'd gone to four. You said the employee should switch to Blue Cross BC BS and receive a 1% wage increase in the second, third, and fourth years. So this is a new offer on wages because before you were only talking about a three-year contract. Now you're talking about a four-year contract. The union agrees to the four-year contract. They agree to switch to the BC BS, and they agree to a wage increase in the first year, and they propose an average wage increase of 2.5 in the last three years. So you still have to talk about that, but they're moving. And that is an overall lower wage than before because of the freeze in the first year. And then you say that's regressive. They disagree, but then they move again. They propose a 0.25 wage increase reduction for each of the contract years that they had proposed. This seems like a lot of back and forth and a lot of movement on both sides. So that's why I'm just really flummoxed by the idea that there's an impasse at this point. So I'm going to back up into the last counterproposal that happened, I believe it was March 10th. So the union's counterproposal was either that they stay on OPEC with no cost sharing with a pay freeze, or that they move to HRD's plan with a 2% wage increase each year, and it's retroactive. So the general negotiations reflect a pattern of giving on one thing, insurance, while regressing or being unwilling to move to HRD's final position on wages. And so then on March 30th, sure, HRD proposed that the new expiration date would be February 2023. So again, it's not necessarily a four-year contract, it's to make it a prospective three-year agreement, again, because we've been bargaining for 14 months here. So the union's counterproposal, it accepts the HRD health plan, but it offers wage increases of about 2.5% per year. But with a freeze in the first year, and the math was done, and that was coming down on wages because of the freeze. So this is where we certainly disagree with the math being done, because first of all, the ALJ did some calculations and took testimony of understanding that was not- But he laid out his calculations and they work, and you don't have a counter calculation. So the ALJ is not permitted to sit judgment on the offer. And the only evidence in the record, and I can point you to that's JA 2175-81, is that HRD did its own analysis of the counter, and it did determine that it was regressive, and that there was no further room for movement. But the ALJ's math is in the record, and I looked at it, and it works. And you're just saying, we have a contrary opinion without saying what that is. And again, this is a deferential standard of review. Again, the bottom line here is that HRD's position was that it was unwilling to move any further on wages. And concluding that- But on March 30th, you went to a four-year contract, which is a move on wages, and the union moved on wages. They changed their position to say, take a freeze in the first year, and then this increase in the latter years. And then they moved again and said, we'll take a smaller increase in the latter years. How is that an impasse? So the impasse here is that we are still leagues away. We are- So the impasse is you just haven't reached an agreement. The impasse is that despite communicating multiple times that we are no longer moving on wages, we were getting- But you moved on March 30th. So I guess the point being is that the act does not compel agreement. It does not tell a party, it does not tell an employer that it must accept a concession on wages or what that- All we're trying to figure out is if there's an impasse, you're both at the end of your rope. There's a finding that you weren't, and it's supported by the evidence. We disagree because at the end, it's at least two times higher than the ultimate position that we were willing to take on wages. And again, because there is no compulsion to reach agreement, HRD's final offer should be credited. It should be allowed to- You're asking us to make a credibility fund? No, we are not. Then why are you saying that? We are- because that's effectively what happened at the board. So the board effectively said that HRD's final position couldn't be final because there was further movement to be made. But again, the union never represented what that movement could be. HRD expressly put forward, let us know if there's any further movement on wages, and the union never responded. It never had any indication of how the parties could reach agreement on wages, and that to us represents impasse. I see I'm over my time, but- Nothing else. Thank you. We'll give you two minutes on rebuttal. Yeah. Ms. Beard. Good morning. My name is Heather Beard for the Labor Relations Board, and we seek enforcement of the board's order in full. I think the discussion just now demonstrates the board's position that substantial evidence supports its finding that the company didn't carry its burden of establishing impasse. Now, my colleague Hood River presents what is its alternative view of the record, but that is not something under the standard of review of this court. This court is to accept. So I would boldly stand here and declare that the discussion between Judge Pan and my colleague, I would like to say that we agree with all of the points that Judge Pan was making in terms of all of those issues with regard to the impasse finding. I would like to circle back, if I may, to Judge Walker's initial question to my colleague about the length of the negotiations. I'd like to address that. So first, what I would say about that is the board itself recognized, and in fact, a finding in terms of the support for the length of these negotiations was the fact that the company initially was asking a big ask. The company was saying, we'd like to save a lot of money. Great. Fine. Nothing wrong with that. Okay. Because of that, what the board found is the protracted negotiations could be expected. An impasse finding is one where both parties exchange offers, move, move, and then determine whether or not they can have a contract at the end of the rope. This is exactly what happened here. So there is, in my view, there's a lot of cases with a lot of months and a lot of factors and impasse. That's the exact issue here, which is the board... My question, Ms. Beard, was are you aware of any cases where a court has concluded there was no valid impasse when the parties negotiated for 14 months? I do not know as I stand here, unfortunately. However, I believe there are cases where there are similar months, like the length of negotiations has been long. There are many cases with that. But that's one of five factors and this is not... So that's my answer to that question. There was September 27th, 2019 offer from Hood River. And there was a March 30th, 2020 offer. You're looking at like, maybe you want me to describe the September offer or do you know what I'm talking about? I know exactly what you're talking about. What's the difference between those offers? Right. So on September 27th, the Hood River offer was not an offer for a three-year... It was an offer for a three-year, not a four. Are you asking March 10th? I'm sorry, March 30th. Because I know that on March 30th, as Judge Pan was stating, they were saying we will do a wage freeze in the first year, but we will have a 1% increase in the back end on the last year of the contract. Sorry, can you say that a little slower? I apologize. I'm so excited about this. Everyone left after the last argument. So they had known how exciting... I mean, impasse is the most exciting of all the labor laws. So on March 30th, negotiations were going on prior to March 30th and days and months were passing. So what the company was doing is saying, at the end of the contract, let's add on another year of the contract. And in response to that, the union had moved in that meeting to say, okay, that's fine. We'll give up our retroactive to the date that the contract would have started offer. So the difference between the offer in September of 2019 was the company saying, at the last two years of the three-year contract, we'll give you just a 1% increase and we're not going to give you retroactive to the date this contract would have started. So the wages were different in the offer of March 30th. The other thing that was different is that the union, okay, that's one other thing I need to emphasize here. Whether or not Hood River thought it was at its end of its rope is not the end, to torture that metaphor, it's not the end of the discussion. There has to be a contemporaneous understanding of the parties. And the union was not ever at the end of this rope is what this demonstrates. But nonetheless, the offer that HRD made was different in terms of wages. And the union had moved to, by March 30th, say, okay, we'll give up our great health insurance plan and we'll move to HRD. And what the board recognized is in that- I just want to make sure I have the answer to the question, which is the only difference between the September 27th, 2019 offer and March 30th, 2020 offer was this kind of three-year versus four-year retroactive date issue. There also was in the union access- there are two other issues besides wages and pension. There was a union access policy when the union comes on to the plant and they're not also employees, how many hours do they have to give in terms of notice that they're there? And at one point, HRD, and I believe it was between September and March that HRD gave up one of the things it was asking for, which was, we want you to have to have 24-hour access. There was some movement there that HRD gave up the 24-hour access. That seems pretty on the margins. Well, that was one that you asked me the difference. No, I know. I want a complete answer in the now. My follow-up question is, and that- Sorry, can I just- I think a big change too, wasn't it? September was where they decided they're switching to BCPS. Thank you, Judge Pan. Which is an important change. Yes, thank you, Judge Pan. That was an important change because switching to the HR plan does not, like as Judge Pan said, it doesn't include something significant, which is the healthcare change plan. And that took- that meant that the company was giving different benefits. And in fact, the union needed to give that sort of analysis, get a third-party analysis and communicate it to its employees. We'll get to the analysis. Sure. So I just want to make sure I have this. There was the three-year to four-year change. There's this union access policy, and then there's a switch. So after September 27th, 2019, there was a switch from Blue Cross Blue Shield to Cigna. That's correct. From Cigna to Blue Cross. Cigna to- Okay. And then what's the- you were maybe going to tell me one other- Yeah, there was a discrepancy throughout about language for the 401k plan. And the 401k plan was what was going to be the matching formula that the employer was going to do. And the contract previously had some language that the parties went back and forth over. Should we change the language? Is the language okay? Should it be 230? There were all sorts of arguments about that. And the very- the thing that matters is that the March 30th offer, the company had a little asterisk next to it accepting the union's access policy and said, if you accept the union's access policy, we'll accept your 401k policy. So they were willing to exchange those two proposals. Okay. Then new questions, but still somewhat fact-related questions for you. You say in your brief that Hood River repeatedly labeled its offers final. You provide three dates, November 1st, 14th, and December 17th. Or December 14th. Yeah. Okay. A date in December. Yeah. As I read the ALJ's fact findings that were formed by the board, all three of those dates refer to the same offer. The September 27th offer. That's correct. Great. And then, grateful for your patience here. Just want to make sure I have the facts, all the facts right. In February 2019, Hood River suggested a mediator. Sorry, that's February 20th. I mean, February 2020. In February 2020, Hood River suggested a mediator. And at that point, the union said they didn't think the mediator was appropriate. Correct. Correct. Okay. Then the government- sorry, government. That was the last case. We're the government. Well, all three cases. The governor's executive orders in March of 2020 about COVID prevented an in-person meeting between Hood River, the union, and the mediator. That's correct. I would love to just say yes, but I'm going to say yes, but if you'll let me. Yes, but there is a discrepancy between when you say with the mediator, the union believed, and again, important is what the union and the company believed, that the mediator would agree to meet in person, but the company and their communications with the mediator believed that the mediator would not do that. So, parties disagree as to what the mediator would do. The governor would not- The governor's orders, yes. The governor's orders- Governor's orders said at that point, at one point, the governor's orders, like it was was changing 25. So, I'm not sure at that exact point if it was the 25 people in the same room, and I would note that as we note, and it was in the facts, Hood River in its March 30th telephone meeting did have its principals in the same room, six feet apart in distance. So, I don't want to quibble over that. There was just- I'm not asking what each side believed about the governor. Okay. I'm just asking you. Right. I would say that the governor's orders- I'm not sure. I'm going to say I don't know. I don't know if the governor's orders strictly precluded any in-person meetings the way that maybe the union would have sent one person. They never agreed to do it without a mediator. I thought that the order prohibited in office as long as telework was possible. Right. I'm going to actually- That's how the ALJ said that. Yes. If that's what the ALJ said, then that's- And the board affirmed it. I'm going to- I don't want- No, I apologize. I do think, though, that shows that at the time, people were trying their best in good faith to figure out what the orders meant and if they could do what they wanted to do within them. And I don't want to suggest being glib about how serious COVID was. Right. No, I didn't take you to be risking that. In June 2019, the union proposed a 2.5% wage increase. Am I remembering that right? It might not be. Yeah. I think it was 2.5% in June. If you give me one second, I can give you the exact- Yep. The union's proposal, after they gave their what-if proposal, yes, they said, if you were going to take the offer that was not going to be- Well, actually, they said, the what-if proposal will freeze wages. And that's what they said in June, and that was what was rejected. So, I guess your question is, what was their movement on June 25th? No, I'm eventually going to get to what was their movement after this, but I'm just trying to- June 20- Okay. Get down what they were saying in June 20- Yes. In June 20- About wages. Yes. June 24th, they made their third contract proposal, which they went from their original, that went from 4% in the first contract year and 3% in the second and third contract years, to a 2.5% increase in each year of a three-year contract, with a first increase that would be retroactive to March 1st. Okay. And then, I think nine months later, the union proposed a nearly identical offer. The only difference was that it was a 2.25% wage increase. They moved a quarter reduction in that- With the wage freeze in the first year. Correct. Yes. Those were the only differences? Those were the significant differences, along with the change in the health care plan that the union agreed that it would switch to, which, again, opened up a lot of other- But I know you just want to stick to the fact question. Well, no. I am trying to figure out. So, the proposal from June 24th, 2019, fast forward to March 10th, 2020, those offers were- And maybe this is the same. I think it's the same question I asked. So, no, it's not. It's different. So, those offers were nearly, on the key issues, identical, except for they gave up 0.25% on wages. And what else? And accepted a wage freeze in the first year. Accepted a wage freeze in the first year. Yes. Okay. Then- And they switched their health care. They agreed to the health care. And they made concessions on health care. On the question of good faith and dilatory bargaining, the union, Hood River made an October 4th request for availability, and that was not answered until December 11th. Is that correct? There were times like that where the union did not email the employer back right away, and vice versa. However, those time gaps- What does that mean? There were times when the company didn't respond right away to the union either. So, there were delays. There were times where the company waited two months and a week to respond? No. About availability? No. Okay. The company, though, during that time knew that what the union was doing is trying to assess the health care plan and compare it- That's my next question. So, not the first comparison, but the second health care plan comparison, which occurred after Hood River switched providers. Right. That took two months. My first question, that new plan was, would you say, materially identical to the old plan or materially different? I am not aware of whether it was material identical or not. I know that there was no finding and there was no evidence that the union delayed purposefully in getting that third-party assessment. And, in fact, I also know the union on March 30th- Importantly, this answers one of the questions you were talking about with my colleague. The union did say where its movement could be. When the union was asking, and Hood River eventually provided this after March 30th, they wanted to know the cost that would save Hood River to go to Blue Cross Blue Shield. And they wanted to know that because, as the union bargaining agent testified, if there were significant cost savings to Hood River from the new health care plan, separate from what the benefits would be to the employees in a different way, those were things the union could consider in formulating its next wage offer. So, for example, the company was not going to be saving a significant amount of money. The union may not have had in its wage offer something higher. So, I understand that a comparison between the two health plans would be important for the union's negotiating position. And I take you to have just said there was not a finding that the two months it took to run the comparison was unreasonable. I don't really see why it should take two months to compare two health plans, especially when I think federal employees only have three weeks during open enrollment to compare their health plans. And unlike the union, it's not our job to compare health plans. Is it correct that between December 4th and January 9th, it was the company that didn't get back to the union? There were definitely, right, there was not necessarily a two-month, two-and-a-half month, as you just described it, Judge Walker, but there were times the parties didn't get back. That was a month that the company. The company, yes, absolutely. From December 4th to January 9th. Yes. Then between June 24th and July 22nd, also four-week periods. But I'm just saying, once the union had the two health plans to compare, how long did it take? Right. I think the first time when it had Cigna compared to OPEC, it took five weeks, and it took, I believe, as you said, two months for it to compare. Now, and I think- So that's my question on the second one, that it took two months to compare. Why? Right. Because they wanted to not only make sure that the employees had comparable benefits to they had under OPEC, but they also had to check with their employees to see what their employees would accept before they could get back to the company. This was something that was thrust on them just then. And I would say, as a federal employee who looks at my health care benefits, sometimes it takes me longer to decide what to do. And I think that in this instance, because they had done a comparison of OPEC to Cigna, and then looking for, oh, now the company wants, instead of Cigna, to do Blue Cross, they took them some time. And I think the key, though, to this court's review role here is whether or not the view of the evidence is compelled here, that the union in some way was dilatory throughout these months. And that is just not what the record shows. I think that two months to compare two health plans and two months, October 4th to December 11th, just to respond to an email about availability strikes me as quite dilatory, never mind requiring or insisting on an in-person meeting when it could easily have been done by Zoom. And no one was allowed to meet in person strikes me as somewhat dilatory. But would you say we are at an impasse? I would say we may be at a good faith impasse. But we can break the impasse, although this isn't a case about breaking any impasse when there wasn't one to begin with. Let me ask my colleagues if they have additional questions. Thank you. Thank you. Ms. Petrova, we'll give you two minutes. Thank you. I'm going to try to succinctly cover a couple of points. So the first is on impasse. So to the extent we're not talking about exception to impasse, I did want to just highlight that this court held in Mike Sell's potato chip company, that if an employer is firm during bargaining as to one or more of the essential issues in Japan, I know your concept of how the position shifted slightly towards the end. But if an offer is consistent with and flows logically from a position of we're not going to increase wages past this 1%, then the union's failure to agree creates an impasse. And just the denial that impasse exists or some last minute movement under that case law is not enough to avoid impasse. Our position is that that's what we have in this case, because there is no dispute that despite 14 months of bargaining, the union never once offered a proposal that met both of the bottom lines that HRD had put forward on insurance and wages. And I just also want to bring this court's attention to other case law from this court, like TrueServe Corporation, where a finding of no impasse was not supported by substantial evidence in the record, where the parties bargained eight times over six weeks. And at the end, the union's wage demand was twice as high as what the employer was willing to do. And the union failed to explain how it had any further room for movement on that issue. And that's exactly what we have here in this case. I do want to address quickly the exception to impasse. I do think the delays are quite significant in this case. Again, my colleague here did not have a case to illustrate where someone who had bargained for 14 months and the record reflects that affirmatively sought to repeatedly schedule bargaining was not at impasse or was not able to move forward with implementing a last final offer under an exception. So just as a very concrete example of the delay, on November 27, 2019, the union received its health care comparison, which took more than two months to procure. It did not communicate this to HRD. And the first dates that the union offered for bargaining in response to HRD's efforts to, again, move forward bargaining were in late January. And when January didn't work out and we're not contesting, it was nobody's fault for the January dates not working out. The union refused to schedule anything in February and instead only offer dates in March. That all, in conjunction with the long history of the case and these efforts to continuously put bargaining out further, that alone meets the exception to impasse. It should be sufficient to qualify as an exception to impasse. If you could wrap it up in the next couple seconds, please. Thank you, Your Honor. For all the reasons that we've already discussed, either because there was an impasse or the exception to impasse existed, we would ask that this court vacate the board's order. Thank you very much. Thank you for your argument.
judges: Walker; Childs; Pan